UNITED STATES of America, Plaintiff,

v.

Harold B. ALLEN, Phillip M. Blackman, John A. Carpenter, Isaiah Clayton, Thomas Dillon, Henry Dunning, Elbert L. Elfreeze, Jerry Gordon, Everett L. Gully, Anthony Harden, Brady Harden, Carnell Jarrell, Alfred Jefferson, Alvin Jefferson, Sue Jefferson, Thure Mills, Irene Myers, Evans Neal, Charles Newsome, Gerald Prestwood, John Rodgers, Fred Sanders, Fred Smith, Maurice Smith, Willie J. Smith, Robert L. Stephenson, Orville Stewart, Curtis Stokes, Fred J. Tilford, Van Torrence, Arvell West, Richard Williams, and Clarence G. Wilson, Defendants.

No. 88 CR 831–1–33.

United States District Court, N.D. Illinois, E.D.

May 2, 1990.

William H. Theis, Chicago, Ill., for Harold B. Allen.

Nan R. Nolan, Chicago, Ill., for Phillip M. Blackman.

Richard C. Leng, Chicago, Ill., for John A. Carpenter.

Michael B. Mann, Zavislak & Mann Ltd., Hillside, Ill., for Isaiah E. Clayton.

Daniel G. Martin, U.S. Federal Defender Program (Staff), Paul A. Wagner, Chicago, Ill., for Thomas Dillon.

John M. Kalnins, Chicago, Ill., for Henry Dunning.

Marc R. Kadish, Legal Services Center, Chicago, Ill., for Elbert L. Elfreeze.

Marvin Leavitt, Leavitt & Schneider, Chicago, Ill., for Anthony Harden, Fred Smith.

Vester L. Van, Chicago, Ill., for Alfred Jefferson, Charles Newsome.

Michael Brohman, Lincolnwood, Ill., for Alvin Jefferson.

Loraine A. Ray, Chicago, Ill., for Irene Myers.

Candice Green, Chicago, Ill., for Evans Neal.

Joseph A. Ettinger, Ettinger & Schoenfield Ltd., Chicago, Ill., for Gerald Prestwood.

Daniel G. Martin, U.S. Federal Defender Program (Staff), Chicago, Ill., June B. Fournier, Hillside, Ill., for John Rodgers.

William J. Stevens, Foss Schuman & Drake, Chicago, Ill., for Willie J. Smith.

Patrick T. Driscoll, Jr., Chicago, Ill., for Robert L. Stephenson.

Linda Amdur, Chicago, Ill., for Curtis Stokes.

Jo-Anne F. Wolfson, Chicago, Ill., for Fred J. Tilford.

Anita Rivkin-Carothers, Chicago, Ill., for Van Torrence.

Elliott Muse, Chicago, Ill., for Arvell West.

Mary Quinn, for Richard Williams.

Paul Bradley, Chicago, Ill., for Clarence G. Wilson.

Victoria J. Peters, for the U.S.

### ORDER

NORGLE, District Judge.

Before the court is the joint motion of defendants Clayton, Sanders, Stokes, Blackman, Carpenter, Meyers, Stephenson, Stewart, West, Gully, Tilford and Wilson to conduct a hearing, pursuant to Federal Rule of Evidence 606(b), to inquire into the validity of the guilty verdicts rendered against them. The government has filed a consolidated response.

The motion, which asks the court to inquire of jurors and others, is based upon post-verdict assertions to the media. In support, defense counsel have submitted copies of newspaper, magazine, and television accounts of certain post-verdict statements. Of these statements, those attributed to several jurors were made after the verdicts were returned in open court and after the polling of the individual jurors. However, no juror has made a post-verdict statement under oath. In addition, the news accounts submitted also include statements made by several defense attorneys.

■ Collateral attacks on jury verdicts are generally not allowed. *See United States v. Burke*, 781 F.2d 1234, 1246 (7th Cir.1985). Even when allowed only in specific instances, collateral attacks on jury verdicts inherently carry with them a general threat to the principal of trial by jury.

■ Our Anglo–American scheme of ordered liberty mandates that, before the imposition of punishment, criminal defendants be given "fair trials designed to end in just judgments." Equally fundamental is a criminal defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). So fundamental is this right that it "lies at the foundation of the federal rule that jeopardy attaches when the jury is empaneled and sworn." *Crist v. Bretz*, 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978). Consistent with the double jeopardy provisions of the fifth amendment, a judge may not declare a mistrial over the defendant's own objections, even for the defendant's own benefit, unless there is a "manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824); *accord Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

Our confidence in the jury system would be misplaced if jurors were constrained from deliberating freely. Inquiry, or even the threat of inquiry, into jury deliberations is necessarily contrary to free deliberation. Consequently, the privileged and secret nature of grand and petit juries has been recognized back to the 17th century and was imported into our federal common law. In *Clark v. United States*, 289 U.S. 1, 13, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933), the Court recognized a privilege for the votes and deliberations of a petit jury, noting that references to the privilege "bear with them the implication of an immemorial tradition." Eventually, with respect to grand juries, these privileges were codified in Fed.R.Crim.P. 6, as "an integral part of our criminal justice system." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S.

211, 218–19 n. 9, 99 S.Ct. 1667, 1672 n. 9, 60 L.Ed.2d 156 (1979).

It is not surprising that the roots of the tradition of limiting collateral attacks on jury verdicts are as long as those of the privilege for jury deliberations. Historically, in 1785, in *Valise v. Delaval*, Lord Mansfield refused to consider affidavits showing that the jurors had agreed on a verdict by lot, on the ground that "a witness shall not be heard to allege his own turpitude." 1 T.R. 11, 99 Eng.Rep. 944 (K.B.1785). The Supreme Court has long since recognized that attacking a verdict based upon the internal deliberations of a jury is unwise. In *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), the Court stated:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of fact which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

238 U.S. at 267–68, 35 S.Ct. at 784. Scholars who have considered the propriety of inquiring into the verdicts reached by jurors have not quarreled with the Court's conclusion. Professor Wigmore discussed the issue in the following terms:

> [T]he verdict as uttered is the sole embodiment of the jury's act and must stand as such without regard to the motives or beliefs which have led up to its act. The policy which requires this is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the

loss of all certainty in the verdict, the impracticality of seeking for definiteness in the preliminary views, the risk of misrepresentations after disclosure of the verdict, and the impossibility of expecting any end to trials if the grounds of the verdict were allowed to effect its overthrow.

8 Wigmore, *Evidence* § 2349 (McNaughton ed.1961).

The law views the verdict of the jurors as reflecting the conscience of the community. *See United States v. Grier*, 866 F.2d 908, 929 (7th Cir.1989). The viability of the jury as a decision making body is dependent upon the interaction of individuals in a collective process. There is always the chance that one juror with irrational ideas will thwart the fair minded, rational other eleven. This is a risk we willingly take. The quest for "perfect" justice will always be limited by human frailties. Yet, this limitation, inherent in entrusting fundamental decisions to the collective determination of individual members of society, is also our system's greatest asset. One juror may also be the protector of truth and justice and foil the majority bent upon an erroneous verdict. The balancing mechanism the law provides is that the verdict of the jury be unanimous. Jury unanimity rests upon the concept of complete and full deliberation in the jury room.

■ Reliance upon complete and full deliberation is founded on the premises that those deliberations are based upon only that evidence admitted at trial. "A criminal defendant has a right to be tried on the basis of the evidence admitted at his trial, ...." *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982) (en banc). Reverence for the deliberative process is not justified when the deliberations are not within the parameters of the law, because the jury was subject to extraneous information or influence. Where this may have happened, the fear of interfering with jury deliberations in general, which prevents inquiry into the specifics of an individual jury deliberation, is outweighed by the concern for an erroneous result in the individual case.

Therefore, although innumerable cases have applied Lord Mansfield's rule and the rational in *McDonald v. Pless, see, e.g., Michaels v. Michaels*, 767 F.2d 1185, 1204–05 (7th Cir.1985), the Supreme Court, since 1892, has distinguished between evidence as to extraneous influences and evidence as to the operation of the jury's thought processes. In *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the Court held admissible jurors' affidavits indicating that they had read newspaper comments pertaining to the trial during their deliberations. The Court quoted from a Massachusetts Supreme Judicial Court opinion in announcing the following rule:

> [A] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

146 U.S. at 149, 13 S.Ct. at 53, *quoting Woodward v. Leavitt*, 107 Mass. 453 (1871).

■ Fed.R.Evid. 606(b), which governs the issue before the court, is essentially a codification of the rule announced in *Mattox*. Specifically and strictly limiting both the basis and the nature of any inquiry into verdict validity, it provides as follows:

> Fed.R.Evid. Rule 606(b)——Inquiry into validity of verdict or indictment.—Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The rule does allow jurors to testify as to whether extraneous information or any

outside influence reached them. *See Rushen v. Spain*, 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 457 n. 5, 78 L.Ed.2d 267 (1983). However, it prohibits jurors from giving post-verdict testimony as to whether their deliberations, in fact, were prejudiced by the extraneous information or outside influence. *Id.; United States ex rel. Buckhana v. Lane*, 787 F.2d 230, 238 (7th Cir. 1986), (*quoting Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir.1983) (trial court reversed for considering juror's statement as to impact tampered evidence had on deliberations); *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir.1984); *United States v. Kimberlin*, 805 F.2d 210, 243–46 (7th Cir.1986).

Rule 606(b) was designed to protect the entirety of the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes. Fed.R.Evid. 606 Advisory Committee Note. Not only are the jurors protected from being pestered by lawyers after verdicts are rendered, but also the judicial process is protected from efforts to undermine verdicts by scrutinizing the jurors' thoughts and deliberations. *United States v. Ford*, 840 F.2d 460, 465 (7th Cir.1988); *citing United States v. Schwartz*, 787 F.2d 257, 261–62 (7th Cir.1986). "[T]he rule of exclusion fosters important public policies, including . . .; encouraging open discussion among jurors; reducing incentives for jury tampering; promoting verdict finality; and maintaining the jury as a viable decision-making body." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1158–59 (7th Cir.1987) *citing State v. Shillcutt*, 119 Wisc.2d 788, 350 N.W.2d 686, 689 (1984); *Attridge v. Cencorp Div. of Dover Technologies Intern. Inc.*, 836 F.2d 113 (2nd Cir.1987). It also prevents individual jurors from manipulating the system by later repudiating the verdict when their views were in the minority. *See In re Beverly Hills Fire Litigation*, 695 F.2d 207, 213 (6th Cir.1982) (doubts of juror subsequent to verdict do not necessitate new trial).

▇▇▇ In a criminal case, any private communication or contact with a juror during a trial about a matter pending before the jury creates a presumption of prejudice. However, this presumption is not conclusive. *See Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). "[D]ue process does not require a new trial every time a juror [or jury] has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, . . . ."). Once it determines that the jury has been subject to extraneous information or outside influence, the district court must make an objective assessment of whether there is a reasonable possibility that the jury's decision has been prejudiced by the outside influence or whether it was harmless. *Wiedemann*, 722 F.2d at 336–37; *citing United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir.1982) (en banc); *see also United States v. Hornung*, 848 F.2d 1040 (10th Cir.1988); *United States v. Gerardi*, 586 F.2d 896, 898 (1st Cir.1978). The determination is objective precisely because the trial judge cannot rely upon any testimony of the jurors as to their subjective assessment of the actual impact of the extraneous evidence or influence on their deliberations.

In making this objective determination the trial judge is aided by his familiarity with the proceedings. In *Bruscino*, it was discovered that the jury had been exposed to two documents not in evidence. One was a newspaper article stating that co-defendants had pled guilty. 687 F.2d at 939–40. In affirming the trial court's conclusion that it was unlikely that the jury had been prejudiced, the *Bruscino* court noted:

> The trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided. He has had the opportunity to observe the jurors' demeanor and gauge their attentiveness, as the appellate judges have not. He can also judge, as we cannot, whether the atmosphere of the trial—that congeries of intangibles that no stenographic transcript can convey—might have made the jury receptive to

being prejudice by the documents in question, or, for that matter, might have inoculated it against such prejudice.

687 F.2d at 941.

■ Of the post-verdict juror statements before the court, the vast majority are of the exact nature proscribed and rendered inadmissable by rule 606(b). The submissions of counsel in support of the motion indicate that the questions put to certain jurors by a reporter went directly to the mental and deliberative process of the two jurors who appeared on television. Examples of those questions are: "Did you believe everything she said when she was testifying on the stand?" "Did you believe that some of the things you heard her say was a lie?" "How did you interpret that?" "Did the fact that one of the jurors was threatened, did that scare them in anyway?" Perhaps the question that most clearly illustrates that the motion would go directly into the jury's deliberations is: "Well, do you think it would have affected the way they voted?" Other submissions of counsel recount assertions of jurors on what occurred in the jury room and how they did when deliberating and do now feel about the verdict. The submissions also contain assertions which would apparently support the verdict. However, these, even if offered by the government, in response to defendants' motion, to support the verdict are similarly inadmissible.

■ Only the statements (1) that a juror who had been threatened informed the other jurors of the threat[1] and (2) that one juror learned from a relative of media coverage of the threat concern extraneous evidence or influence. These statements, if under oath, would be admissable under Rule 606(b). However, there is no need to conduct a hearing to elicit these statements again or to resubmit them in affidavit form. The court will presume that those statements in fact were made and conduct the appropriate objective inquiry as to

whether there is a reasonable possibility that prejudice resulted.

■ At this point, some background information regarding the trial is necessary. Thirty-three persons were named in the original indictment. Before trial, the government moved to dismiss charges against one defendant for mental health reasons, one defendant died, fifteen defendants pleaded guilty before trial, the jury returned verdicts as to fourteen defendants, and the remaining defendant pleaded guilty following a mistrial as to him.

The evidence in this case consisted primarily of tape recorded conversations amongst co-conspirators and Officer White. In the opening statements the Government unquestionably informed the jury that Officer White was acting in an undercover capacity. Officer White repeatedly, on direct and redirect testimony, advised the jury that she was playing the role of a corrupt police officer. The recordings were audio and in many cases audio and video. The recordings contained the voices and pictures of various co-conspirators. The jury heard and saw them in open court during the trial and had all of them available during their deliberations.

■ Fourteen defense attorneys were given the opportunity to attack and contest the recordings. Fourteen defense attorneys were given the opportunity to cross-examine Officer White regarding what she said, saw and did. The overwhelming evidence, however, came directly out of the mouths of the co-conspirators via the recordings. No amount of cross-examination of Officer White could change the actual language used by the defendants who appeared on the recordings. Further, no amount of cross-examination could eliminate the actual cash payments made. No amount of cross-examination could erase the pictures of various defendants on the video recordings in the apartment of Officer White. Overwhelming evidence of the defendants' guilt is a consideration in de-

---

**1.** The impact both of this threat on the individual juror who had been threatened and of that juror's brief contact with the FBI, as a consequence of her reporting the threat, are not at

issue here, having been dealt with in detail at a hearing specifically called and conducted for that purpose prior to the return of the verdicts.

termining whether there is a reasonable possibility that the extraneous influence prejudiced defendants or was harmless. *See United States v. Hornung*, 848 F.2d at 1045–46; *see also Port Terminal Warehousing Co. v. John S. James Co.*, 92 F.R.D. 100, 106 (S.D.Ga.1981) (applying same principle in civil context).

The jury had a full and complete opportunity to judge the credibility of the witnesses. It is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); *United States v. D'Antonio*, 801 F.2d 979, 982 (7th Cir.1986).

The jury was repeatedly advised by counsel for the prosecution, the defense and the court to make its decision upon the evidence. During the voir dire, the opening statements, closing arguments and in instructions given to the jury, the jurors were told to make their decision based upon the evidence produced in court. From time to time during the trial, the court advised the jurors to keep an open mind and to wait until they had seen and heard all of the evidence before making a decision in the case. The jurors were told that the evidence would come from the witness stand and other evidence received in open court. The jurors were given the opportunity to take notes. The audio and video tapes were available to the jury during deliberations.

The jurors were instructed: "It is your duty to determine the facts from the evidence in this case. You are to apply the law given to you in these instructions and to the facts and in this way decide the case."

Other instructions relating to the evidence were given. Some follow:

The evidence consists of the sworn testimony of the witnesses, the exhibits received in evidence, and stipulated facts.

A stipulation is an agreed statement of facts between the parties, and you should regard agreed statements as true.

You are to consider only the evidence received in this case. You should consider this evidence in the light of your own observations and experiences in life. You may draw such reasonable inferences as you believe to be justified from proved facts.

You are to disregard any evidence to which I sustained an objection or which I ordered stricken. Anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded. You should not be influenced by sympathy, prejudice, fear or public opinion.

\*　　\*　　\*　　\*　　\*　　\*

You should decide this case solely on the evidence presented here in the courtroom. You must completely disregard any press, television or radio reports which you may have read, seen or heard. Such reports are not evidence; therefore, you must not be influenced in any manner whatever by such publicity.

\*　　\*　　\*　　\*　　\*　　\*

There are two types of evidence: direct and circumstantial. Direct evidence is the testimony of a person who claims to have personal knowledge of an event such as an eyewitness. Circumstantial evidence is the proof of a chain of facts and circumstances which tend to show whether the defendant is guilty or not guilty. The law makes no distinction between the weight to be given either direct or circumstantial evidence. Therefore, all of the evidence in the case, including the circumstantial evidence should be considered by you in arriving at your verdict.

\*　　\*　　\*　　\*　　\*　　\*

The weight to be given to any particular evidence is not necessarily determined by the number of witnesses testifying on behalf of each side. You are to consider all the evidence in the case in determining the credibility of witnesses. You may find that the testimony of a smaller number of witnesses to one side is more

credible than the testimony of a greater number of witnesses for the other side.

\* \* \* \* \* \*

You have heard testimony of expert witnesses. This testimony is admissible where the subject matter involved requires knowledge, special study, training, or skill not within ordinary experience, and the witness is qualified to give an expert opinion.

However, the fact that an expert has given an opinion does not mean that it is binding upon you or that you are obligated to accept the expert's opinion as to the facts. You should assess the weight to be given to the expert opinion in the light of all the evidence in this case.

\* \* \* \* \* \*

There have been admitted in evidence certain schedules or summaries. Their accuracy has been challenged by the defendants. Thus the original material upon which the exhibits are based have also been admitted into evidence so that you may determine whether the schedules or summaries are accurate.

\* \* \* \* \* \*

You are the sole judges of the credibility of witnesses, and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account the witness' intelligence, ability and opportunity to observe, age, memory, and manner while testifying, and any interest, bias or prejudice the witness may have, and the reasonableness of the witness' testimony considered in the light of all the evidence in the case.

\* \* \* \* \* \*

Neither by these instructions, nor by any ruling or remark which I have made, do I mean to indicate any opinion as to the facts or as to what your verdict should be. You are the sole and exclusive judges of the facts.

There is a strong presumption that jurors follow instructions. *See United States v. Cauble*, 532 F.Supp. 804, 809–10 (E.D.Tex. 1982).

The verdicts were returned by an unanimous jury on January 9, 1989, in open court. Afterward, the jurors were polled. The Clerk asked each individual juror by name, in open court, and in the presence of each other: "Was this and is this now your verdict?" Each juror answered, "Yes." Any juror, rational or irrational, thus had an opportunity to speak in open court.

Before the actual polling of the jurors, the fourteen defense counsel were given an opportunity to suggest a form of polling inquiry other than the one routinely and traditionally given. Counsel was offered the opportunity to but chose not to offer a polling inquiry other than the one actually recited by the minute clerk in open court.

The following summarizes the verdicts:

```
ALLEN ..........NOT GUILTY AS CHARGED........... 1/5/90
CLAYTON .......GUILTY AS CHARGED ................ 1/5/90
JARRELL........NOT GUILTY AS CHARGED........... 1/5/90
SANDERS .......GUILTY CT. 1, NOT GUILTY CT. 32 .. 1/5/90
STOKES .........GUILTY AS CHARGED ................ 1/5/90
BLACKMAN .....GUILTY AS CHARGED ................ 1/8/90
CARPENTER ....GUILTY AS CHARGED ................ 1/8/90
MYERS ..........GUILTY AS CHARGED ................ 1/8/90
STEPHENSON ...GUILTY CT. 1, NOT GUILTY CT. 2.... 1/8/90
STEWART .......GUILTY AS CHARGED ................ 1/8/90
WEST ..........GUILTY AS CHARGED ................ 1/8/90
GULLY .........GUILTY AS CHARGED ................ 1/9/90
TILFORD .......GUILTY CT. 1, NOT GUILTY CT. 12 .. 1/9/90
WILSON .........GUILTY AS CHARGED ................ 1/9/90
```

The jury had advised the court before January 9, 1990, that certain verdicts had been reached as to certain defendants. The verdicts of January 5, and 8, 1990, inferentially are those. All of the verdicts were signed, were read aloud by the foreperson in open court, and were the subject of the polling on January 9, 1990.

The court has had the opportunity to observe the 12 regular members of the jury and the original 4 alternate jurors. Each day as the trial progressed, the court saw them personally as each juror entered the courtroom and left and observed them closely as they listened to the evidence. The court observed several members of the jury taking notes during the course of the trial, as was agreed by counsel. The jurors were attentive. They listened closely to the testimony, including the extensive cross examination of the witnesses. They were not bored. The trial was interesting factually. The jurors appeared to be in good humor. They seemed to smile, even to laugh, at appropriate times during the course of the trial. They seemed to enjoy the zealous but professional advocacy of the experienced attorneys in the case. The defendants were all respectful to the court, counsel, and the jury. Order was maintained at all times with no difficulty whatsoever. The court never observed any indication of jurors in fear. There was no observable indication of trepidation, reaction to public interest, or untoward pressure or tension.

It is unfortunate that one juror was threatened and that other jurors learned of this threat. However, this is not altogether uncommon. Moreover, in other instances, even absent an overt threat, the background of defendants, as revealed solely by admissible evidence at trial, may carry with it the potential for an "implicitly" threatening atmosphere. Yet, to say that this potential or a single threat of the type encountered here creates an irrebuttable presumption that the jury was prejudiced, would place administration of the law in the hands of the lawless. Few criminal trials could be successfully completed. *See Smith v. Phillips*, 455 U.S. at 217, 102 S.Ct. at 946 (it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote).

An objective view of the nature of the verdicts reached would not support a finding that this jury was irrational, controlled by emotion, passion, fear or any other improper influence. The contrary appears objectively true. The verdicts indicate that the jury considered the evidence as to each count and as to each defendant. The jury found some defendants not guilty on all counts, some defendants guilty on all counts, and some defendants guilty on some counts and not guilty on others.

That the jury deliberated for hours over several days and reached verdicts on each of the three days shows neither a rush to a verdict, nor a patent disregard of the evidence, arguments of counsel or the instructions of the court. That the jury advised the court and counsel by sending out unsolicited notes of issues being discussed may be perceived as unusual, but there is nothing objectively improper about doing so. That the notes indicate initial disagreement amongst the jury may well be expected in a multicount indictment with fourteen defendants after a long trial. The evidence in this case was not complex, but there was much of it.

After careful consideration, it is the court's conclusion that there is no reasonable possibility that the jury was prejudiced by extraneous influence. The jury was both "capable and willing" to decide this case solely upon the evidence properly before it. Rather than put the jury to another test by conducting a post-judgment inquiry into their deliberative process, the court should recognize that the jury has done its duty by rendering a fair verdict based upon the evidence presented in open court and the instructions of law given to them by the court. Accordingly, the defendants' motion is denied.

IT IS SO ORDERED.